IN THE U.S. BANKRUPTCY COURT
DISTRICT OF KANSAS (KANSAS CITY)

| | | |
|---|---|---|
| In re: Plate Restaurant, LLC, | ) | |
| | ) | |
| Debtor, | ) | Case No. 25-20996-dls |
| | ) | Jointly Administered |
| BBB63, LLC | ) | Chapter 11 |
| | ) | |
| Creditor, | ) | |
| v. | ) | |
| | ) | |
| Plate Restaurant, LLC | ) | |
| | ) | |
| Debtor. | ) | |

## MOTION TO COMPEL PAYMENT OF POST-PETITION RENT AND TO COMPEL ASSUMPTION OR REJECTION OF UNEXPIRED LEASE

Creditor BBB63, LLC ("Landlord"), through counsel, moves for an Order compelling Plate Restaurant, LLC ("Debtor") to pay its post-petition rent and obligations under the terms of the parties' unexpired lease of nonresidential real property and further compelling Debtor's assumption or rejection of such lease agreement. Alternatively, Landlord requests relief from the Automatic Stay or adequate protection. In support of its Motion, Landlord states the following:

### JURISDICTION AND VENUE

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157. This matter is also a core proceeding pursuant to 28 U.S.C. § 157(b)(2) and Landlord consents to the Court entering a final order or judgment on Landlord's Motion.

2.      Venue is proper pursuant to 28 U.S.C. § 1409(a).

### PARTIES/BACKGROUND

3.      Landlord and Debtor are parties to a written lease agreement (the Lease) dated September 8, 2018 (the "Lease"), and the First Amendment to said Lease dated May 16, 2024 (the "Lease Amendment"). Copies of the Lease and Lease Amendment are attached as Exhibits 1 and 2 and are incorporated by reference.

1

4.	Pursuant to the terms of the Lease and Lease Amendment, the premises leased to Debtor comprise approximately 7970 square feet of restaurant space located at 701 E. 63rd St., Kansas City, MO 64110 (the "Premises"). Exhibits 1 – 2.

5.	The Lease Term does not expire until April 30, 2029. Exhibit 2.

6.	Under the terms of the Lease Amendment, Debtor is required to pay base rent in the amount of $11,290.83 on the first of each month, plus a late charge of 5% of the amount due if not paid within ten days after its due date. Exhibits 1 – 2.

7.	Debtor is further required to pay a patio fee of 4% of gross receipts generated from the patio each month. Exhibit 2.

8.	Debtor is also required to pay amortized past rents totaling $60,000.00 in the amount of $2,500.00 due monthly until paid in full. Debtor can receive a credit of up to $30,000.00 against the $60,000.00 balance if it turns in receipts for work completed improving the premises since having the Lease renewed. Exhibits 1 - 2.

9.	Debtor is further required to pay percentage rent in the amount of 7% of its gross monthly sales in excess of the "break point" of $1,935,428.50 in annual sales. Debtor has not reported its gross monthly sales from May 1, 2024 through August 1, 2025 which are due on the 10th of each month. Exhibits 1 - 2.

10.	Debtor is also required to pay operating and maintenance costs as Additional Rent. Exhibits 1 – 2.

11.	Debtor is also required to pay monthly water charges to Landlord. Exhibits 1 – 2.

12.	Debtor is further required to pay Landlord's attorneys' fees and costs incurred in enforcing the terms of the Lease and Lease Amendment. Exhibits 1 – 2.

13.	Debtor is further required to pay, as additional rent, Four Percent (4%) of gross receipts generated from Debtor's use of the patio area of the Premises. Exhibits 1 – 2.

14.	Debtor is further required to maintain the Premises in a clean, orderly, healthful condition and to not disturb the quiet enjoyment of other tenants located in the same building. Exhibits 1 – 2.

15.	Under the terms of the Lease, as Amended, Debtor is required to deliver Point of

Sale reports to Creditor by the 10th day of each month. Exhibit 2.

16. Debtor has failed to pay water utility charges when due.

17. Debtor has also failed to provide Point of Sale Reports to Creditor by the 10th date of each month as required under the terms of the Lease Agreement. As a direct and proximate result of Debtor's failure to report gross receipts, Creditor is unable to determine the exact amount of post-petition past due rent due and owing from Debtor.

18. Debtor has further breached the lease by failing to clean the grease trap at the Premises, which has caused flooding at the Premises thereby interfering the other tenants' quiet use and enjoyment of the building where the Premises is located. Creditor has also incurred charges and expenses due to Debtor's failure to clean the grease trap as it had to hire a plumber and pay to have the drainage lines attached to the grease trap jet-washed to remove any blockage of same.

19. Debtor has also breached the lease by failing to ensure the flooring at the Premises is properly sealed which has caused water to leak into the premises of another tenant thereby interfering with the other tenant's quiet use and enjoyment of its rental property and subjecting Landlord to additional fees and costs.

20. On July 18, 2025, Debtor filed its Bankruptcy Case by filing a voluntary Petition for relief under Chapter 11, Sub-Chapter V of the United States Bankruptcy Code under Case No. 25-20998 (Doc. 1).

21. On July 18, 2025, Debtor filed a Motion for Joint Administration in Case No. 25-20998 (Doc. 11), which the Court granted on August 11, 2025 thereby designating Administration to occur under Lead Case No. 25-20996 (Doc. 46).

22. Debtor remains in possession of the Premises despite its non-payment of rent and other amounts due.

23. Landlord requests payment of all post-petition amounts owing under the Lease and Lease Amendment as required by 11 U.S.C. § 365(d)(3) of the Bankruptcy Code.

24.　　Landlord calculates the post-petition amounts due and owing[1] under the Lease as of the date of this Motion as follows:

| Late Fees: | $651.90 |
|---|---|
| Water Usage Fees | $1,533.17 |
| Maintenance Fees | $1,760.00 |
| Attorneys' Fees/Costs | $2,077.50 |
| Total: | $6,022.57 |

## **RELIEF REQUESTED**

**A. Cause exists to compel payment of post-petition rent and related obligations.**

25.　　As demonstrated above, Debtor has failed and refused to pay water usage and maintenance fees when due and owing under the terms of the Parties' Lease Agreement and Amendment to same. Debtor has further failed to comply with its maintenance obligations and its obligation to report its gross revenues on a monthly basis. Pursuant to the Bankruptcy Code, Debtor, as a party in possession of Landlord's Premises, is required to "timely perform all of the obligations of the debtor…arising from and after the order for relief under any unexpired lease of nonresidential real property, until such lease is assumed or rejected, notwithstanding section 503(b)(1)." 11 U.S.C. § 365(d)(3). The above language is intended to relieve landlords who are involuntary creditors during the post-petition period of "the uncertainty of collecting fixed rent in the lease 'in fully, promptly, and without legal expense.'" See e.g. *HA-LO Industries, Inc. v. CenterPoint Properties Trust,* 342 F.3d 794, 799 (7th Cir. 2003) (quoting *In re Handy Andy Home Improvement Centers, Inc.,* 144 F.3d 1125, 1128 (7th Cir. 1998)). Section 365(d)(3) further requires payment of other amounts accruing under an unexpired lease prior to rejection, including post-petition late fees, interest, and legal fees. See e.g. *In re MS Freight Distribution, Inc.*, 172 B.R. 976, 978-79 (Bankr. W.D. Wash. 1994) (holding § 365(d)(3) requires payment of post-

---

[1] Creditor reserves the right to include, as post-petition rent, any amounts found due and owing from Debtor's gross receipts and its gross receipts from the use of the patio area of the Premises once Creditor is able to obtain monthly point of sale reports from Debtor.

4

petition interest, late fees, and attorneys' fees as provided in the applicable lease).

26.     Debtor is in default of its post-petition payment, maintenance, and reporting obligations and has not assumed or rejected the Lease. Section 365(d)(3) is designed to protect Landlord from becoming an involuntary post-petition creditor while waiting for Debtor to decide whether to accept or assume the Lease. See *HA-LO*, 342 F.3d at 799. Given the clear requirements of § 365(d)(3), Debtor should not be permitted to continue possessing and using the Premises when it is in material breach of its payment, maintenance, and reporting obligations during the course of this Bankruptcy case. Consequently, cause exists for the Court to order Debtor to make immediate payment of post-petition rent and other payments to Landlord, to provide all past-due point of sale and gross receipts reports, to comply with all maintenance obligations, including, but not limited to, properly cleaning out the grease trap at the Premises as needed and no less than once per month and further provide Landlord with proof of such cleaning by a Landlord approved, professional cleaner, to properly seal flooring at the Premises to prevent water leakage into other rental units, and to further order Debtor to make all post-petition payments on the first day of every month until the effective date of Debtor's rejection of the Lease. See e.g. *In re Telesphere Communications, Inc.,* 148 B.R. 525, 532 (Bankr. N.D. Ill. 1992) (ordering immediate payment of rent due despite debtor's claim of administrative insolvency); see also *In re C.Q., Inc.*, 343 B.R. 915, 918 (Bankr. W.D. Wis. 2005) (same).

**B. Cause exists to require Debtor to assume or reject the Lease.**

27.     Section 365(d)(4) of the Bankruptcy Code requires Chapter 11 debtors to assume or reject an unexpired lease of nonresidential real property within 120 days of the commencement of debtor's case, or the lease is deemed rejected, absent an extension approved by the Court. Though the 120-day period has not expired, Debtor's failure to comply with the requirements of 11 U.S.C. § 365(d)(3) constitutes sufficient cause to require Debtor to immediately assume or reject Landlord's Lease.

28.     Notwithstanding Debtor's default on its payment, maintenance, and reporting obligations to Landlord, Landlord has been prevented from exercising its rights under the Lease and applicable state law to terminate the Lease and regain possession of the Premises. Under the

5

circumstances, absent Debtor filing an immediate motion to assume or reject Landlord's Lease, the Lease should be declared rejected due to Debtor's failure to comply with § 365(d)(3), and the Court should further order Debtor to vacate and surrender the Premises to Landlord.

**C. Alternatively, cause exists for the Court to grant relief from the Automatic Stay.**

29.     Section 362 of the Bankruptcy Code permits the Court to grant relief from the Automatic Stay for cause, including lack of adequate protection of a party's interest in real property.  11 U.S.C. § 362(d).  Cause to lift the Automatic Stay is made on a case-by-case basis. See e.g. *In re Busch*, 294 B.R. 137, 140 (BAP 10th Cir. 2003).

30.     Landlord requests entry of an Order granting relief from the Automatic Stay in the event Debtor is not compelled to perform its post-petition obligations to Landlord or Debtor is not compelled to reject or assume the Lease.

31.     Landlord further requests that any Order granting Stay Relief waive the 14-day extension of the Automatic Stay of Fed. R. Bankr. P. 4001(a)(3).

32.     Landlord further requests that the Stay Relief order contain a provision that the Order will survive the conversion of Debtor's case to a Chapter 7 proceeding.

33.     Creditor further requests permission to communicate with Debtor and Debtor's counsel to the extent provided for under applicable nonbankruptcy law.

WHEREFORE, Landlord requests the Court grant the following relief:

(a) Order Debtor to immediately pay Landlord all post-petition amounts due under the Lease, including rent, late charges, and other charges described herein;

(b) Order Debtor to immediately file a Motion to assume or reject the Lease or otherwise deem the Lease rejected;

(c) Order Debtor to make timely payments to Landlord of all additional post-petition amounts due under the Lease as they come due, including rent and other charges due on the 1st day of each month, until the effective date of Debtor's rejection of the Lease;

(d) Order Debtor to provide monthly point of sale and gross revenue receipts for May 1, 2024 through August 1, 2025 and all subsequent months during Debtor's Bankruptcy on or before the 10th day of each month so that Landlord can calculate additional post-

6

petition rents due and owing from Debtor;

(e) Order Debtor to have the grease trap at the Premises cleaned by a professional cleaner approved by Landlord as needed and no less than once per month and further provide Landlord with proof of such cleaning;

(f) Order Debtor to have the flooring at the Premises sealed by a flooring professional approved by Landlord to prevent water from leading into other rental units and to provide Landlord with proof of such sealing

(g) Alternatively, grant Landlord relief from the Automatic Stay as to the Lease and Premises so that Landlord may pursue an *in rem* judgment in state court to recover possession of the Premises;

(h) Declare that any Stay Relief Order granted shall waive the 14-day extension of the Automatic Stay of Fed. R. Bankr. P. 4001(a)(3);

(i) Provide that upon entry of Stay Relief, Creditor shall be allowed to communicate with Debtor and/or Debtor's counsel as permitted under applicable nonbankruptcy law;

(j) Declare that the Stay Relief Order shall survive conversion of Debtor's Case to a Chapter 7 proceeding; and

(k) Provide any other relief that the Court deems proper.

Respectfully Submitted,

ANDERSON & ASSOCIATES

By: */s/ Julie Anderson*
Julie A. Anderson #21871
Michael J. Wambolt #24354
1901 W. 47th Pl., Ste. 300
Westwood, KS 66205
913-262-2207 phone
913-262-2247 fax
julie@mokslaw.com
michael@mokslaw.com
Creditor's Attorney

7

## <u>CERTIFICATE OF SERVICE</u>

      The undersigned certifies that on September 26, 2025, a true and correct copy of the foregoing was filed and served electronically via the Court's CM/ECF system, by electronic mail, and/or by U.S. mail, postage prepaid, to:

Plate Restaurant, LLC
701 E. 63rd St., 1st Flr., Ste. 100
Kansas City, MO 64110

Debtor's Attorney
George Thomas
geojthomas@gmail.com

Christian Joseph
christian@platekc.com

Sub Chapter V Trustee
Robbin L. Messerli
P.O. Box 8686
Prairie Village, KS 66208

U.S. Trustee
Richard A. Kear
Richard.kear@usdoj.gov
John Nemecek
John.nemecek@usdoj.gov
Jordan M. Sickman
Jordan.sickman@usdoj.gov

Austin B. Hayden
ahayden@phwjlaw.com

                          */s/ Julie A. Anderson*
                          Julie A. Anderson

File Code: 39475

Exhibit 1

# LEASE

This Lease is made and entered into between **BB63II LLC, A Missouri Limited Liability Company** ("Landlord') and, Plate Restaurant LLC ("Tenant") on this 8th day of September 2018, which is the Effective Date of this Agreement.

**WITNESSETH,** in consideration of the obligation of Tenant to pay rent and in consideration of the other terms, covenants and conditions hereof, Landlord hereby demises and leases to Tenant, the Premises to have and to hold for the lease term specified herein, all upon the terms and conditions set forth in this Lease.

## BASIC PROVISIONS

1.  The following basic provisions shall be construed in conjunction with, and limited by, reference thereto in other provisions of this Lease:

    A. **Landlord:** BB63, LLC
    601 E 63rd Street | Ste. 170
    Kansas City, Missouri 64110
    (816) 421-0244 Office
    TenantHelp@Screenland.com

    B. **Tenant:** Christian Joseph
    Plate Restaurant LLC
    701 E 63rd Street, First Floor, Suite 100
    Kansas City MO 64110
    Tel: 816-377-6579
    Email: christian@platekc.com
    EIN:

    C. **Premises:** Approximately 7053 square feet for a **total rentable area of 7970 square feet**, not including the patio. known as a part of the building located at 701 e. 63rd street, KCMO, being more particularly outlined on the plan attached as Exhibit "A." *The tenant shall have shared use of the common hallway in the north entrance, first floor. If Tenant uses space as a waiting area, Tenant shall clean space each night.* Tenant shall have use of 30 unmarked off-street spaces in the parking lots during normal business hours of 8:00am to 6:00pm, and shall have use of the unoccupied parking spaces after 6:00pm and on weekends, to the degree that such use does not infringe on the ability of other tenants to park. The Landlord shall build out a Patio on the north and west portions of the premises, which the Tenant will use as outdoor space that will be leased separate from the total rentable area for a 4% share of gross receipts generated from the Patio, subject to the remaining terms and conditions of this lease. All maintenance of the patio space shall be the responsibility of the Tenant.

    D. **Tenant's Percentage:** Total rentable area in the above building is 30,000 square feet and Tenant's proportionate share is approximately twenty-six and one-half percent (26.5%), known as Tenant's Percentage.

    E. **Lease Term:** A period of Sixty (60) months commencing on June 1st, 2019 (the "Commencement Date") and ending on April 30th, 2024, (the "Expiration Date") Tenant shall have the option to renew this lease for an additional 5-year period. Said renewal must be exercised at least 6 months prior to the termination of the initial term. Notwithstanding the foregoing, if the space is ready for occupancy prior to that date, the parties agree that the tenant may commence operations earlier on a per-diem rent basis of $371.21.

    F. **Base Rent: (5-year Term)** $677,450.00 (Six Hundred Seventy-Seven Thousand Four Hundred Fifty and 00/100 Dollars) payable in monthly installments in advance, during the Lease Term according to the following schedule:

    | | | |
    |---|---|---|
    | Months 1-60 | $11,290.83/monthly | $135,490.00/annually |
    | Months 61-120 | $12,465.00/monthly | $149,580.00/annually (If exercised) |

    Rent shall be paid to Landlord or the Agent of the Landlord at 601 East 63rd Street, Suite 170, Kansas City, MO 64110, or at such other place as Landlord shall designate.

G. **Additional Rent:** Additional Rent shall be Tenant's Percentage of the increase in operating and maintenance expenses as defined in Section 13.

H. **Pre-Paid Rental:** Eleven Thousand Two Hundred Ninety and 83/100 Dollars ($11,290.83) representing payment of the first monthly installment of rent for the first month of the lease, payable thirty days prior to possession.

**Security Deposit:** Eleven Thousand Two Hundred Ninety and 83/100 Dollars ($11,290.83) payable upon execution of this Lease.

## PAYMENT OF RENT

2. Tenant agrees to pay Base Rent in monthly installments in advance on the first day of each and every month during the term, with proration for any partial month's occupancy, without demand, setoff, or deduction except Tenant shall pay the first monthly installment pursuant to section 1(H). Any rent payment not received by Landlord within ten (10) days after its due date shall be subject to a delinquency charge of five percent *(5%)* of the amount due each full or partial calendar month the rent remains unpaid. Failure by Tenant to pay the late charge within ten (10) days after receipt of notice from Landlord that it is due shall, in addition to any other default, constitute a default of this Lease by Tenant.

## POSSESSION

3. Landlord shall use due diligence to deliver possession of the Premises to Tenant as nearly as possible at the beginning of the term of this Lease. In the event Landlord cannot deliver possession to Tenant at the Commencement Date, this Lease shall not be void or voidable, nor shall Landlord be liable to Tenant for any loss or damage resulting from such failure, except as described in this section. Tenant shall not be liable for any rent except for the prepaid rental until such time as Landlord can and does deliver possession. The Landlord shall assist in Tenant finish improvements. The Tenant shall be performing part of the Tenant finish as well. If Tenant responsibilities such as the kitchen, and other buildout is delayed and shall prevent occupancy, and Landlord responsibilities are complete, then Rent shall commence on schedule. The rent shall not commence if Tenant delay was a result of Landlord delay that prevented Tenant from completing its work, such as rough in plumbing, wall construction, etc. If Landlord's tenant finish responsibilities are the sole cause of a delay in possession, any such delay after June 3, 2019 will result in damages that are difficult to ascertain, Landlord will be responsible for liquidated damages payable to Tenant in future rent abatement in the amount of $7500.00 per week until possession is granted. Any such abatement will be triggered only after reasonable attempts are made to mitigate such liquidated damages through a meeting with the parties on or about February 1ˢᵗ, 2019 in order to determine possession. Any damages must be actually sustained by Tenant in the form of salaries and equipment rentals, and paid as a rent credit against rents.

## QUIET ENJOYMENT

4. Landlord hereby covenants that Tenant, upon paying rent as provided, and performing all covenants and agreements contained in this Lease to be performed by Tenant, shall and may peacefully and quietly have, hold and enjoy the Premises. Nothing in this section shall prevent Landlord from performing alterations or repairs and additions to or on other portions of the building, nor shall performance of such alterations or repairs or additions be construed as a breach of this covenant by Landlord, subject to the terms stated in section 8 of this agreement. Landlord shall not permit offensive odors to emit during construction and shall not use equipment which might make undue noise and vibration, though the parties recognize that the building shall require build-outs that will occasionally cause noise and vibration, but the Landlord shall use every effort to minimize that disturbance.

## ASSIGNMENT-SUBLETTING

5. Tenant shall not sublet, assign, transfer, mortgage, pledge or encumber this Lease or any interest herein or any portion hereof or permit or suffer any other person (the employees, agents, servants and invitees of Tenant excepted) to occupy or use the Premises, or any portion thereof, without the prior written consent of Landlord, which consent shall not be unreasonably withheld. Permission is, however, granted Tenant to assign this Lease and also to sublet to any subsidiary corporation of Tenant, or parent corporation of Tenant, upon giving Landlord written notice. In the event of any assignment or subletting, Tenant shall remain the principal obligor under all covenants of this Lease, and by accepting any assignment or subletting, an assignee or subtenant shall become bound by and shall perform and shall become entitled to the benefit of all of the terms, conditions and covenants by which the Tenant is bound. A consent to any such assignment, subletting,

occupation or use by any other person shall not be deemed to be a consent to any subsequent assignment, subletting, occupation or use by another person. Any such assignment or subletting without such consent shall be void, and shall, at the option of the Landlord, constitute a default under the Lease. Any subletting or assignment consented to by Landlord shall be evidenced only in writing and in form acceptable to Landlord.

## USE

6. Tenant shall only use and occupy the Premises for use as a Restaurant, and for no other purpose without the Landlord's prior written consent. Landlord will agree to a liquor license as part of Tenant's Restaurant operation. It shall not be later than 1:30 a.m. Further considerations for any "tavern" liquor licenses and/or permits must be obtained with the Landlord's prior and exclusive written consent. Tenant agrees to maintain the Premises in a clean, orderly, healthful condition and to comply with all laws, ordinances, rules and regulations of all governmental agencies. Tenant will not use the Premises for any unlawful, disruptive, or extra—hazardous purpose; or any public or private nuisance; or disturb the quiet enjoyment of any other tenant; or permit any operation which might emit offensive odors into other portions, (The parties recognizing that there will be some ancillary odor from a restaurant, but cooking vents will direct the odors away from other occupied areas of the building).; or use any apparatus which might make undue noise or set off vibrations; or permit anything which would increase the fire insurance rate or other insurance rates on the building or contents. Tenant will not permit the Premises to be used for any purpose, which, in Landlord's opinion, impairs the reputation or character of the building. Tenant shall not install nor permit the installation of any signs in or upon the Premises, which are visible from the exterior hereof without the written consent of Landlord, as described in 34H, which consent shall not be unreasonably withheld. Tenant shall not obstruct or use the sidewalks, entries, passages, vestibules, halls, elevators, or stairways of the building for any purpose other than ingress or egress to and from the Premises, or throw, or sweep, or put anything out of the windows or doors, or in the passages or corridors of the building.

## REPAIRS AND IMPROVEMENTS

7. Landlord shall be making general improvements to the property during Tenant's occupancy. Landlord and its contractors shall use due care not to interfere with Tenant's use of the Premises during construction. Landlord anticipates making improvements to the exterior of the building, as well as tenant finish in parts of the building not occupied by the Tenant. The Landlord will deliver the premises to the Tenant in a "white Box" condition, per the terms of the *Tenant Finish Addendum.*

## ALTERATIONS

8. Any built-in improvements made by the Tenant or Landlord (including Tenant contractors) shall remain with the property and be the property of the Landlord at the termination of this lease.

## SERVICES

9. Tenant shall pay for utilities and shall set up any and all utility accounts in its own name. Water shall be sub-metered and billed to the Tenant by Landlord or its agent. Tenant shall be responsible for any Internet, Trash removal and telephones. Tenant shall be responsible for the maintenance of its space with-in the building, including janitorial. Landlord is responsible for common area janitorial and common area maintenance of the elevator and entryways, sidewalk and parking lot snow clearance (parking lots owned by the landlord as part of this property, not rented spaces by tenant). (Janitorial in common areas shall consist of trash emptying, light dusting and vacuuming once week). Tenant shall be responsible for all repairs within the suite (other than mechanical failure of the HVAC that is under warranty and any renovation work performed by the Landlord or its contractors that has failed due to workmanship or material failure). Tenant shall be responsible for any glass breakage within its suite, including any exterior glass in its suite. Tenant shall be responsible for light bulb replacement in its suite.

## ENTRY

10. Landlord, its officers, agents and representatives shall have the right to enter into and upon the Premises, at reasonable times to inspect same or clean or make repairs or alterations or additions as Landlord may deem necessary, or for any purpose whatsoever relating to the safety, protection or preservation of the building, and Landlord may and shall at all time, have master keys or pass keys to the Premises. Tenant shall not change any locks or install locks in the doors of the Premises, or install other devices or systems, which would restrict access to the Premises, without Landlord's prior written consent. If Tenant shall not be present to open and permit entry into the Premises at any time, Landlord may enter the same by master key or passkey or may forcibly enter the same, without rendering Landlord liable therefore, provided that during such entry Landlord shall take reasonable care of Tenant's property. Landlord shall have the right at any time for the purposes of

inspection, maintenance, adjustment and balancing the controls of the HVAC systems, repair, environmental audits or abatement to erect, use, maintain, repair, replace or relocate pipes, ducts, wiring conduits and similar devices in and through the Premises and to enter upon the Premises for the purpose of the performance of any such work whether same are used in the supply of services to the Tenant or the other occupants of the building. Nothing contained above shall be deemed to impose upon the Landlord, any obligation, responsibility or liability whatsoever for the care, supervision or repair of the building or the Premises or any part thereof, and Tenant shall be entitled to no abatement of rent or reduction of rent by reason thereof. Landlord shall further have the right to enter the Premises at reasonable hours to exhibit same to prospective purchasers, lenders or tenants and to inspect the Premises to see that Tenant is complying with all of its obligations hereunder, or to make repairs or modifications to any adjoining space or to the building.

Landlord shall take every step to attempt to notify Tenant of entry and await approval from Tenant. However, if Landlord finds it necessary to enter for emergencies or maintenance work that would require entry, Landlord retains the right to do so. Landlord shall make every reasonable attempt to give Tenant advance notice of maintenance required entries when possible.

## ADDITIONAL RENT

11. During the term of this Lease and any extension or renewal thereof, Tenant shall pay, as Additional Rent, Tenant's Percentage of any increase in Landlord's operating and maintenance costs of the building, over and above the amount of such operating and maintenance costs Landlord incurred during the Base Year.

Such adjustment, if any, shall be determined by Landlord as soon as reasonably possible after the end of each calendar year and the amount of such adjustment shall be due and payable by Tenant upon receipt of the notice of the amount. The adjustment for the calendar year during which occupancy commenced or could have commenced shall be prorated based on the number of calendar months of occupancy, or when occupancy could have commenced as compared to the full calendar year. Any adjustment for the calendar year in which the Lease expired, or was renewed or extended, shall be prorated based on the number of calendar months of occupancy during the calendar year and shall be paid by Tenant on or before the date of expiration, renewal or extension.

## OPERATING AND MAINTENANCE COSTS

12. The term "operating and maintenance costs" shall be defined as the sum of any and all costs, expenses, and disbursements of every kind and character which Landlord shall incur, pay or become obligated to pay in any calendar year in connection with the ownership, operation, maintenance, repair, replacement, and security of the building and land upon which the building is located, and or all related improvements and appurtenances thereto. The expenses shall include but not be limited to the following: real estate taxes and assessments; rent taxes, gross receipts taxes, water and sewer charges; insurance premiums; license, permit and inspection charges; utilities; service contracts; labor; building management; air conditioning, heating and elevator maintenance; supplies; maintenance to all other parts of the building; security; garbage service; maintenance and upkeep costs of all parking areas, drives, lawns, trees, shrubbery and common areas; and the cost of contesting by appropriate proceedings increases in real estate taxes and assessments and the applicability to, or the validity of, any statute, ordinance, rule or regulation affecting the building or land which might increase operating expenses.

The term "real estate taxes" shall mean all taxes general and special, levied or assessed on the land and the building improvements of which the Premises is a part, and on any land and/or improvements now or hereafter owned by Landlord that provide the building on the Premises with parking or other services.

Operating and maintenance costs shall not include the cost of capital improvement, e expenses for repairs, replacements, and general maintenance paid by proceeds of insurance or by Tenant or other third parties; alterations attributable solely to tenants of the building other than Tenant; principal and interest payments made by Landlord on mortgages on the building; depreciation; and leasing commissions and other non—operating debts of Landlord.

Tenant, at its expense, shall have the right once per calendar year following prior written notice to Landlord, to audit Landlord's books and records relating to operating and maintenance costs during the year preceding such audit. In the event such an audit demonstrates Additional Rent collected for such preceding year to be higher or lower than the amount of Additional Rent actually due pursuant to this paragraph, then within ten (10) days of such determination Landlord shall refund any overpayment, or Tenant shall pay any underpayment. The Base Year for this Lease is 2020.

## CONDEMNATION

13. Should the Premises or the building be taken or condemned in whole or in part under the power of eminent domain, or sold

or disposed of under threat of condemnation, then Landlord shall receive the entire award for such taking or shall receive the entire payment made in lieu of condemnation, and Tenant shall have no claim thereto; provided, however, Landlord shall not be entitled to any award made directly to Tenant for loss of Tenant's business, depreciation to and cost of removal of stock and office furniture. In the event of total condemnation or conveyance in lieu thereof, the Lease term shall terminate on the date the condemning authority takes possession of the building, and in the event of a partial taking or conveyance in lieu thereof the Landlord may, at its option, terminate the Lease Term as of the date of the taking of possession or the partial taking by the condemning authority.

## CASUALTY

14. If the building or the Premises are made partially or substantially untenantable by fire or other casualty, Landlord may elect either to (a) terminate this Lease as of the date of such fire or other casualty by delivery of notice of termination to Tenant within Thirty (30) days after said date, or (b) without termination of this Lease, proceed with due diligence to repair, restore or rehabilitate the building or the Premises, other than leasehold improvements installed by Tenant or paid for by Tenant. In the event such fire or other casualty is due to an act of negligence by Tenant, its employees, agents, servants, invitees or guests, such repair, restoration or rehabilitation of the building or the Premises or both shall be paid for by Tenant to the extent that Landlord's receipt of proceeds from its fire and extended coverage insurance policies are insufficient to complete such repair, restoration or rehabilitation. If Landlord elects not to repair, and the building or the Premises, or both, have been damaged by casualty due to the act or neglect of Tenant, his employees, agents, servants, invitees or guests, the Tenant shall pay to the Landlord upon demand the difference between the proceeds received by Landlord from its fire and extended coverage insurance, if any, and the fair market value of the building or the Premises, or both. If all or any part of the Premises are rendered substantially untenantable, by fire or other casualty not due to an act of negligence of Tenant, its employees, agents, servants, invitees or guests, and this Lease is not terminated, rent shall abate for all or the part of the Premises which are untenantable on a per diem basis from and after the date of the fire or other casualty, and until the Premises are repaired and restored. Tenant's rent abatement, in the event of partial untenantability of the Premises, shall be calculated based upon that portion of the total rent which the amount of square foot area in the Premises that cannot be occupied to the total square foot area of all the Premises. Tenant shall make every good faith effort to obtain an insurance policy that reflects the terms of the foregoing lease provisions within this section, however, should a policy not be available that meets certain conditions herein, the Landlord agrees to meet and confer about waiving such conditions with the Tenant.

## LIABILITY

15. Landlord shall not be liable to Tenant for any loss or damage to any person or property, including the person and property of Tenant, its employees, agents, servants, invitees or guests, occasioned by theft, the acts of any other tenant or the acts of any employee or agent of any other tenant, leaks, casualty, rain, water, condensation, *fire,* acts of God, public enemy, injunction, riot, strike, insurrection, picketing, mob action, bombing, explosion, war, court order, latent defects, requisition or order of government authority, the construction, repair, maintenance or alteration of any part, improvement of the building as a whole, or any other cause not due to Landlord's willful act or negligence. Tenant shall indemnify Landlord and save it harmless from all suits, actions, damages, liability and expense in connection with loss of life, bodily or personal injury or property damage arising from, or out of, any occurrence in, upon, at, or from the Premises or the occupancy or use by Tenant of the Premises or any part thereof, or occasioned wholly or in part by any action or omission of Tenant, its employees, agents, servants, invitees or guests. If Landlord shall be made a party to any action commenced against Tenant, the Tenant shall protect and hold Landlord harmless and shall pay all costs, expenses and attorneys' fees incurred by Landlord.

Landlord shall, throughout the term of this Lease, maintain fire and extended coverage insurance on the Premises in an amount equal to the full insurable value thereof, subject to any allowances for coinsurance rating provisions utilized by Landlord. Landlord shall also carry owner's public liability and property damage insurance coverage on the Premises with limits not less than $1,000,000 combined single limits. Subject to the provisions hereof, all such insurance shall be for the sole benefit of the Landlord and under its sole control.

Tenant, at Tenant's cost and expense, shall maintain comprehensive general liability insurance with contractual and cross liability coverage protecting and indemnifying Landlord and Tenant against any and all claims of liability for injury or damage to person or property or for the loss of life or of property occurring upon, in, or about the Premises, and the public portions of the building caused by, or resulting from, any act or omission (in whole or in part) of Tenant, its employees, agents, servants, invitees or guests; such insurance to afford minimum protection during the term of this lease, of not less than $1,000,000.00 for personal injury to any one person, including death, and $2,000,000.00 for personal injury including death to more than one person arising out of any one occurrence and not less than $1,000,000.00 with respect to property damage. All such insurance shall be effected under valid and enforceable policies; shall be issued by insurers of recognized responsibility and authorized to do business in the state; shall name the Landlord as an additional insured and shall contain a provision whereby the insurer agrees not to cancel without thirty (30) days prior written notice to Landlord. On or before

the Commencement Date, Tenant shall furnish Landlord with certificates evidencing the aforesaid insurance coverage, together with evidence of payment of the premium, and renewal policies or certificates therefore shall be furnished to Landlord at least thirty (30) days prior to the expiration date of each policy for which a certificate was therefore furnished.

Notwithstanding the fact that any liability of Tenant to Landlord may be covered by Tenant's insurance, Tenant's liability shall in no way be limited by the amount of its insurance recovery.

Landlord hereby waives all claims for recovery from Tenant for any loss or damage to Landlord or its property insured under valid and collectible insurance policies to the extent of the proceeds collected under such insurance policies; provided, however, that this waiver shall be effective only as allowed by the applicable insurance policy of Landlord.

## HOLDING OVER

16. If Tenant retains possession of the Premises after the expiration or termination of the Lease Term or any extension thereof by lapse of time or otherwise, Tenant shall pay Landlord rent at a rate equal to *110%* of the rate payable for the month immediately preceding the expiration or termination of the Lease Term, computed on a per-month basis for each month or part thereof that Tenant remains in possession. In addition, thereto, Tenant shall pay Landlord all damages, consequential as well as direct, and for all attorneys' fees and expenses incurred by Landlord in enforcing its rights hereunder, sustained by reason of Tenant's retention of possession. Such retention of possession shall constitute a month-to-month lease. The provisions of this section shall not exclude Landlord's right of reentry or any other right hereunder. If Landlord has not elected to renew this Lease, nothing herein contained shall preclude Landlord from terminating such retention of possession by service of thirty (30) days notice as provided by law. The acceptance by Landlord of any payment of rent subsequent to the commencement of such retention of possession by Tenant shall not be deemed to constitute a waiver by Landlord of any of the provisions of this section.

## RULES AND REGULATIONS OF BUILDING

17. Tenant, its employees, agents, servants, invitees and guests will comply fully with all regulations of the Rules and Regulations of the building as of and hereafter established by Landlord. Landlord shall at all times have the right to change such Rules and Regulations or to amend them in such reasonable manner as may be deemed advisable for safety, care, cleanliness and exterior and interior appearance of the premises and building, and for the preservation of good order and control therein and throughout. All of the Rules and Regulations, changes and amendments thereto will be forwarded to Tenant, and after Tenant's notice of same, Tenant shall carry out and observe all of such Rules, Regulations, changes and amendments. Tenant shall save and hold Landlord harmless from expense or damage resulting from failure to do so.

## RIGHTS RESERVED AND RETAINED BY THE LANDLORD

18. Landlord retains and reserves unto itself all rights not expressly granted to Tenant in this Lease. In addition, Landlord or Landlord's Agent reserves the following rights exercised without liability to Tenant for (i) damage or injury to property, person or business; (ii) causing an actual or constructive eviction, from the Premises; or (iii) disturbing Tenant's use or possession of the Premises:

    A. To name the building and project and to change the name or street address of the building of project;

    B. To install and maintain all signs on the exterior and interior of the building and project.

    C. To grant utility easements or other easements in, or re-plat, subdivide or make other changes in the legal status of the land underlying the building or the project as Landlord shall deem appropriate in its sole discretion, provided such changes do not substantially interfere with Tenant's use of the Premises for the permitted purpose.

## RELOCATION

19. No relocation clause in effect.

## SUBORDINATION AND ATTORNMENT

20. Tenant hereby subordinates all of Tenant's rights, title and interest under this Lease to the lien of any existing and all future mortgages and deeds of trust on the building. Tenant agrees to execute and deliver promptly such agreement and other documents as Landlord may request to confirm and acknowledge the foregoing subordination agreement, and Tenant hereby appoints Landlord as Tenant's Agent to execute and deliver all such agreements and other documents for and in behalf of

Tenant. In the event the lien of any such mortgage or deed of trust is foreclosed or title to the building is conveyed in lieu of foreclosure, Tenant hereby agrees to attorn to the purchaser of the building at any foreclosure sale and the grantee of any such deed and to confirm this Lease and recognize such purchaser or grantee as the Landlord hereunder. So long as Tenant is not in default, this Lease shall remain in full force and effect for the full term hereof.

## ESTOPPEL CERTIFICATE

21. Tenant shall within ten (10) days after written request by Landlord (but no more than twice in a calendar year), deliver to Landlord in writing an executed statement certifying that this Lease is unmodified and in full force and effect, or in the case of lease modifications, that the Lease as modified is in full force and effect, the dates to which rent or other charges have been paid, the amount, if any, of prepaid rent and deposits paid by Tenant to Landlord, the nature and kind of concessions, rental or otherwise, if any, which Tenant has received or is entitled to receive, and that Landlord is not in default under any provision of this Lease, or if in default, a detailed description hereof. Tenant hereby appoints Landlord as Tenant's attorney-in-fact with full power and authority to execute and deliver in the name of Tenant any such certificate in the event Tenant fails to do so on request.

## INTEREST

22. All unpaid amounts of Base Rent and Additional Rent due to Landlord under this Lease shall be subject to a delinquency charge each month at the rate of ten percent (10%) per annum from the due date until paid. All other amounts due to Landlord under this Lease shall be considered as additional rent, and if unpaid when due shall be subject to a delinquency charge each month at the rate of ten percent (10%) per annum from the due date until paid.

## DEFAULT AND REMEDIES

23. In the event: (a) Tenant fails to comply with any term, provision, condition, or covenant of this Lease including the payment of all monies due; (b) Tenant deserts or vacates the Premises for 30 consecutive days or more without notice to Landlord and without making the current rental payment; (c) Any petition is filed by or against Tenant under any Section or Chapter of the Federal Bankruptcy Act, as amended, or under any similar law or statute of the United States or any state thereof; (d) Tenant becomes insolvent or makes a transfer in fraud of creditors; (e) Tenant makes an assignment for benefit of creditors; or (1) a receiver is appointed for Tenant or any of the assets of Tenant; then in any of such events, Tenant shall be in default and Landlord shall have the option to do any one or more of the following: (1) Upon ten (10) days prior written notice, excepting the payment of rent oexpel, remove and put out Tenant or any other persons who might be thereon, together with all personal property found therein; or (2) Landlord may terminate this Lease, or it may from time to time, without terminating this Lease, relet said Premises or any part thereof for such term or terms and at such rent and upon such other terms and conditions as Landlord in its sole discretion may deem advisable, with the right to repair, renovate, remodel, redecorate, alter and change said Premises. Aents received by Landlord from such reletting shall be applied first to the payment of any indebtedness from Tenant to Landlord other than rent and additional rent due hereunder, second to the payment of any cost and expenses of such reletting, including, but not limited to, attorney's fees, advertising fees and real estate brokerage fees, and to the payment of any repairs, renovations, remodeling, redecorations, alterations and changes in the Premises; third to the payment of rent and additional rent due and payable hereunder and interest thereon, and if after applying said monies there is any deficiency in the rent and additional rent and interest to be paid by Tenant under this Lease, Tenant shall pay any such deficiency to Landlord and such deficiency shall be calculated and collected by Landlord monthly. No such re—entry or taking possession of said Premises shall be construed as an election on Landlord's part to terminate this Lease unless a written notice be given to Tenant.

If Tenant vacates or abandons the Premises, any property that Tenant leaves on the Premises shall be deemed to have been abandoned and may either be retained by Landlord as the property of Landlord or may be disposed of at public or private sale in accordance with applicable law as Landlord shall determine in its sole discretion. The proceeds of any public or private sale of Tenant's property, or the then current fair market value of any property retained by Landlord, shall be applied by Landlord against (i) the expenses of Landlord for removal, storage or sale of the property; (ii) the arrears of rent or future rents payable under this Lease; and (iii) any other damages to which Landlord may be entitled hereunder.

Notwithstanding, any such reletting without termination, Landlord may at any time thereafter elect to terminate this Lease for such previous breach and default. Should Landlord at any time terminate this Lease by reason of any default, in addition to any other remedy it may have, it may recover from Tenant the amount at the time of such termination of the excess of the amount of rent and additional rent reserved in this Lease for the balance of the term hereof over the then reasonable rental value of the Premises for the same period. Landlord shall have the right and remedy to seek redress in the courts at any time to correct or remedy any default of Tenant by injunction or otherwise, without such resulting or being deemed a termination of this Lease, and Landlord, whether this Lease has been or is terminated or not, shall have the absolute right

by court action or otherwise to collect any and all amounts of unpaid rent or unpaid additional rent or any other sums due from Tenant to Landlord under this Lease which were or are unpaid at the date of termination. In case it should be necessary for Landlord to bring any action under this Lease, to consult or place said Lease or any amount payable by Tenant thereunder with an attorney concerning or for the enforcement of any of Landlord's rights hereunder, then Tenant agrees in each and any such case to reimburse Landlord for its reasonable attorney's fees. All other remedies herein provided shall be cumulative to all other rights or remedies herein given to Landlord by law. A waiver by Landlord of any default by Tenant in the performance of any of the covenants, terms or conditions hereof shall not be considered or treated as a waiver of any subsequent or other default as to the same or any other matter. If Tenant shall default in the performance of any covenant, agreement, provision or condition herein contained, Landlord, without thereby waiving such default, may perform the same for the account and at the expense of Tenant, without notice in the case of emergency. Bills for any expense incurred by Landlord in connection with any such performance by Landlord for the account of Tenant, as well as bills for any property, material, labor or services provided, furnished or rendered, or caused to be provided, furnished or rendered, by Landlord to Tenant may be sent by Landlord to Tenant monthly, or immediately, at Landlord's option and shall be due and payable by Tenant upon notice of the amount or amounts and the amount or amounts thereof shall be deemed to be Additional Rent under this Lease. Tenant shall promptly give to Landlord notice as herein provided of any defects in the Premises including the failure of Landlord to do anything required to be done by law or by the terms of this Lease or the doing or permitting to be done anything prohibited by law or by the terms of this Lease. Unless Tenant has given said notice and Landlord has failed to commence to cause the cure of said defect within ten (10) days after receipt of said notice, Tenant shall have no right to terminate the said Lease or to declare a forfeiture and in no event shall rent abate except as in this Lease specifically provided. Landlord shall not be obligated to notify Tenant of the due date of rent nor demand payment thereof on its due date, the same being expressly waived by Tenant. The acceptance of any sums of money from the Tenant that is less than the actual amount owed is considered a partial payment and does not relieve Tenant from the full amount that is owed Landlord.

## SECURITY DEPOSIT

24. Tenant at the time of execution of this Lease has deposited with Landlord a Security Deposit to be held by Landlord to guarantee the faithful performance by Tenant of all of the terms and covenants to be kept and performed by Tenant. Said deposit may be co-mingled with other funds and any interest earned shall be the property of the Landlord. Unless and until Tenant is in default with respect to any provision hereof, the Security Deposit shall be the property of Tenant. In the event Tenant is in default and after any necessary notice thereof, Landlord shall apply the whole or any part of such Security Deposit toward the payment of any such amount which Landlord may expect or may be required to expend by reason of default or any damage, expenses or liability caused by default (including, but not limited to, the payment of any rent in default). Tenant shall pay to Landlord on demand the amount necessary in order to restore the Security Deposit to its original amount. Failure of Tenant to restore the Security Deposit within ten (10) days from demand by Landlord shall constitute an act of default under this Lease. In the event that Tenant shall faithfully and fully comply with all the terms, provisions, covenants and conditions of this Lease, the Security Deposit shall be promptly returned to Tenant within thirty (30) days of the end of the term and upon the surrender of the Premises. In the event of any transfer of the building, Landlord may pay over the Security Deposit to the transferee to be held under the terms of this Lease. Under no circumstances shall the Security Deposit be interpreted in any way or manner as being applied to any rental payment due by Tenant hereunder.

## SURVIVAL OF OBLIGATION

25. The obligation of Tenant with respect to the payment of rent accrued and unpaid during the term of obligation of the Lease shall survive the expiration or earlier termination of the Lease.

## HEADINGS

26. The titles and headings in the Lease are used only to facilitate reference, and in no way to define or limit the scope or intent of any of the provisions of this Lease.

## ENTIRE AGREEMENT-AMENDMENTS

27. This Lease constitutes the entire agreement between the parties with respect to the Premises and this Lease covers, merges and includes all agreements, oral or written, between the parties hereto whether made prior to or contemporaneous with the execution of this Lease. This Lease cannot be modified or changed by any verbal statement, promise or agreement and no modification, change nor amendment shall be binding on the parties unless it shall have been agreed to in writing. All pronouns and any variations thereof shall be deemed to refer to the masculine, feminine, neuter, singular or plural, as the identity of the person or persons may require.

## SEVERABILITY

28. In the event any provisions of this Lease be officially found to be contrary to law, or void as against public policy or otherwise, such provisions shall be either modified to conform to the law or considered severable with the remaining provisions hereof continuing in full force and effect.

## SUCCESSORS AND ASSIGNS

29. It is agreed that all the covenants, agreements and conditions herein contained shall extend to, and be binding upon, the respective successors, heirs, executors, administrators, assigns, receivers or other personal representatives of the parties to this Lease.

## NOTICES

30. Any and all notices required or permitted to be given hereunder shall be served either personally or by United States Mail, postage prepaid (and if permitted by law, by Registered, Certified, or Express Mail) at the following Addresses:

    To Landlord: At the address as set forth on page 1, or at such other address as Landlord shall designate by written notice.
    To Tenant: At the Premises or at such other address as Tenant shall designate by written notice to Landlord.

    Each such notice shall be deemed given as of the date it is so deposited in the United States Mail.

## TIME OF THE ESSENCE

31. Time is of the essence of this Lease Agreement.

## RIDERS

32. All riders attached to this Lease as Exhibits and signed by Landlord and Tenant are made a part hereof and are incorporated herein by reference.

## SUPPLEMENTAL PROVISIONS

33. Landlord and Tenant further agree as follows:

    A. No payment by Tenant or receipt by Landlord of a lesser amount than the rent provided for in this Lease shall be deemed to be other than on account of the earliest due rent. Nor shall any endorsement or statement on any check or letter accompanying any check or payment as rent be deemed in accord and satisfaction, and Landlord may accept such check or payment without prejudice to Landlord's right to recover the balance of the rent or pursue any other remedy provided for in this Lease. In connection with the foregoing, Landlord shall have the absolute right in its sole discretion to apply any payment received from Tenant to any amount or other payment of Tenant then not current and due or delinquent. The receipt and acceptance by Landlord of delinquent rent shall not constitute a waiver of any other default but shall constitute only a waiver of timely payment for the particular payment involved. Any waiver by Landlord of any default must be in writing and shall not be a waiver of any other default concerning the same or any other provision of the Lease.

    B. If any provision contained in an addendum to this Lease is inconsistent with any other provision herein, the provision contained in the addendum shall control, unless otherwise provided in the addendum.

    C. Attorney's Fees. If any action or proceeding is brought by either party against the other party to or arising out of this Lease, the finally prevailing party shall be entitled to recover all costs and expenses, including reasonable attorney's fees incurred on account of such action or proceeding.

    D. Landlord may from time to time seek from one or more financial institutions some part or all of the funds to finance the improvements on the property of which the Premises are a part. Neither Landlord nor Tenant shall unreasonably withhold its consent to changes or amendments to the Lease requested by the financing institution on Landlord's interest, so long as these changes do not alter the basic business terms of this Lease or otherwise materially diminish any rights or any obligations of the party from whom consent to such change or amendment is requested.

    The parties agree to promptly sign all changes or amendments reasonably requested to give effect to the provisions of

Case 25-20996     Doc# 78     Filed 09/26/25     Page 17 of 25

this Lease.

E. This Lease shall be construed and enforced in accordance with the laws of the state in which the Premises are located.

F. Notwithstanding anything contained in the Lease to the contrary, Tenant shall have no claim or hereby waives the right to any claim against Landlord for money damages by reason of any refusal, withholding or delaying by the Landlord of any consent, approval or statement of satisfaction, and in such event, Tenant's only remedies shall be an action for specific performance, injunction or declaratory judgment to enforce any right to such consent, etc.

G. If Tenant is a corporation, each individual signing this Lease on behalf of the Tenant represents and warrants that he is duly authorized to execute and deliver this Lease on behalf of the corporation and this Lease is binding on Tenant in accordance with its terms. Tenant shall, at Landlord's request, deliver a certified copy of a Resolution of its Board of Directors authorizing such execution.

H. Tenant has the right to affix a sign to the building or in the lawn at its own cost. Landlord shall have final approval as to design and placement of said sign, but shall make every reasonable effort to accommodate tenant's choices. However, the Landlord shall have the absolute right to a final decision as to style and design in keeping with the historic nature of the building. Tenant shall be responsible for all permits and fees.

I. Financial Statement: The persons signing this Lease on behalf of Tenant hereby personally represents and warrants to Landlord any financial statements delivered to Landlord prior to the execution of this Lease properly reflect the true and correct value of all the assets and liabilities of Tenant. Tenant acknowledges upon entering into this Lease, Landlord is relying upon the accuracy and completeness of such statements.

J. Recording: Recording of this Lease may be done by either party by recording a Memorandum of Lease, however, the Memorandum shall not include information pertaining to rental amounts paid.

**IN WITNESS WHEREOF,** Landlord and Tenant, acting herein by duly authorized individuals, have caused this instrument to be executed in two (2) originals, on the 8th day of September, 2018.

**LANDLORD**

BB63II, LLC

By: _____
Vincent H. Rigby Jr.-Member, BB63II, LLC, Member

**TENANT**

Plate, LLC | EIN

_____
Plate Restaurant LLC, Christian Joseph Managing Member|

## Tenant Finish Addendum

The Landlord shall renovate the Premises and bring it to a "white Box" condition, which shall consist of the following:

1.      Landlord shall bring exterior walls to a finished surface described as floor to ceiling glass on portions of the north and west side, as described in the layout, with sheetrock and primer paint applied to solid walls
2.      preparing floors to be ready for finish, carpet or other treatment
3.      200 amp electrical available for lighting and outlets
4.      HVAC up to 175 square feet per ton without ductwork inside space. )Note: The parties will investigate re-use of existing ductwork).
5.      Landlord shall deliver two restrooms on the floor, as part of the Tenant space, but built out as part of Landlord costs
6.      Tenant shall be given a $25.00 per usable foot allowance for tenant finish
7.      The parties anticipate the Landlord performing the renovations of the dining room, interior wall construction, rough in plumbing and outside areas
8.      Tenant is anticipated to perform Kitchen interiors construction, and trim carpentry, bar top and all booth and furnishings
9.      If Tenant completes any interior work, then they shall obtain all necessary approvals from any applicable government agency, and all contractors MUST sign lien waivers
10.      Any and all improvements to the space shall remain the property of the Landlord at the end of the lease term, or sooner if lease is terminated, or ended earlier
11.      Nonattached equipment such as ovens, appliances not built in, tables, chairs, computers, will remain the property of the Tenant.

## Exhibit A

Space as depicted is the first floor of the building at 701 E 63rd Street,  Kansas City, Missouri, 64110.

-

*Add floor plan here.*

# GUARANTY

This Guaranty is made as of the date first written above by the undersigned whose mailing address is:

Christian Joseph

Kansas City, MO

**WHEREAS,** BB63Il, LLC, ("Landlord") and *Christian Joseph* ("Tenant") have entered into a Lease on the date first written above, pertaining to the real estate commonly known as 701 E. 63rd Street, Suite 100, Kansas, City Missouri, 64110 ("Premises").

**WHEREAS,** Landlord has required, as consideration for entering into this lease, the guarantee of *Christian Joseph.*

**NOW, THEREFORE,** for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged the undersigned do jointly and severally agree that if Tenant shall during the term of the lease, along with any extensions, default in the payment of rent or any other obligation under this lease, *Christian Joseph* shall be liable for any rent, fees, attorney fees or other costs associated with this agreement that would be the responsibility of the tenant.

The Guaranty is primary and not secondary and is without exception. The undersigned waive any and all requirements for notice of default as may be required in the Lease or at law and agree and acknowledge that Landlord has no obligation to pursue any remedy allowed either by law or by the Lease as against Tenant and that the undersigned are jointly and severally liable for all obligations as if they were the Tenant under the Lease.

This Guaranty shall be valid during the first twelve months of the lease and the liability hereunder shall in no way be affected or diminished by reason of any extension of time that may be granted by Landlord to Tenant or any modification of the Lease by Landlord and Tenant.

_____    _____    9/6/18
Christian Joseph                          SS# 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                       Date

Exhibit 2

### First Amendment to Lease

This First Amendment to Lease (this "Amendment") is made and entered into as of **5-16-24**, by and between BB63 II, LLC, a Missouri limited liability company ("Landlord") and Plate Restaurant, LLC., ("Tenant").

Whereas the parties previously entered into that certain Lease dated as of September 8, 2018 (the "Lease"), for the lease of Premises described as 701 e. 63rd St., Suite 100, Kansas City, Missouri 64110.

Now, therefore, in consideration of the mutual covenants contained in this Amendment, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, the parties hereto agree as follows:

1: Period of lease extension and minimum rent

The Lease is hereby extended for a period of five (5) years commencing May 1, 2024 and expiring April 30, 2029, at a base and minimum rent of Eleven Thousand Two Hundred Ninety and 83/100 Dollars ($11,290.83) per month during such extended term. In addition to base rent, there will be percentage rents described later in this amendment. There will also be payments of past due rents amortized over the term of the lease extension, described below.

In addition to base and minimum rent for the restaurant, the Patio, as described in the lease, shall be rented on a basis of Four Percent (4%) of gross receipts generated from the patio.

Option to renew; The Tenant shall have the option to renew the lease at a base rent of $12,418.81 per month plus the percentage rents described in this document. However, the threshold for the 7% percentage rents to commence will be raised to $2,128,938.86 in gross revenues as described below.

2: Past Rents.

The parties agree that the Tenant shall amortize and pay past due rents as of December 31st, 2021, in the amount of Eighty Seven Thousand One Hundred Ninety One and 98/100 Dollars ($87,191.98) in amortized monthly payments of $1,747.15 over the period commencing May 1, 2024, and ending April 30, 2029. Said amortization shall reflect an annual interest rate of 7.5% on said funds.

Past due rents from January 1, 2022 through the date of this amendment shall be paid as follows;

$2,500.00 per month until any and all rents unpaid from the described period that commenced January 1, 2022 to the date of this lease amendment, are paid. Said amount is $60,792.53 through January 2024. Also credited against the $60,792.53 will be any tenant finish improvements made by the Tenant, up to $30,000.00. (Described below). *This monthly payment will commence June 1, 2024*

3: Additional Tenant Improvement funds from the Landlord.

The Landlord agrees to provide Thirty Thousand Dollars ($30,000.00) to the Tenant to be used for Tenant Improvements to the Premises. As is the case in the original lease agreement, any and all improvements made by Tenant shall become the property of the Landlord and left with the Premises upon termination of the lease agreement. The Landlord provided Tenant Finish dollars shall be a credit toward the past due rents from January 1, 2022 through the date of this amendment as described in paragraph 2 of this amendment.

Therefore the base rent will be modified as follows:
Base rent:                    $11,290.83
Prior rent                    $1,747.15 monthly

Total base monthly commencing May 1, 2024 $13,037.98

Any utilities or other charges allowable under the original lease shall be billed to the tenant per the terms of the original lease in addition to this monthly rent and past rent reimbursements.

4: Percentage Rent.

In addition to base/minimum rent and Patio rent, amortized past rent and amortized Tenant Finish Contributions from the Landlord, Tenant shall pay to Landlord during each Lease Year during the Term, as Additional Rent, an amount equal to seven percent (7%) of Tenant's "Gross Sales" (as defined below) in excess of an amount (the "Break Point")($1,935,428.50) equal to the result obtained by dividing the Minimum Rent for the period for which Percentage Rent is being determined by seven percent (7%). Percentage Rent shall accrue from the Rent Commencement Date, shall be calculated on a monthly basis, and shall be due and payable monthly beginning at such time as Tenant's reports of Gross Sales delivered pursuant to Section 3.03 reflect that Gross Sales exceed the Break Point. Percentage Rent shall be due, in arrears, on the first day of the month next following the month in which Gross Sales exceed the Break Point for any preceding month and on the first day of each month thereafter. Percentage Rent for any partial month falling within the Lease Term shall be paid at the specified rate for all Gross Sales during such portion of the month in excess of a pro rata share of the Break Point, based upon the number of days in such partial month.

Example of Percentage Rent: In the event Tenant's cumulative Gross Sales during any Lease Year are $2,432,142.85, then the Percentage Rent payable by Tenant during such Lease Year shall be an amount equal to:

$2,432,142.85 - $1,935,428.50 = $496,714.35 (i.e., Gross Sales in excess of the Break Point)
$496,714.35 x 7% = $34,770.00.

Once the threshold described in this paragraph is realized, any patio sales shall simply be treated as rents of 7% of patio sales along with the rest of the revenues. All patio sales during the year shall be included in the break point.

This additional rent shall commence May 1, 2024 and shall be calculated for all months from that date forward through the end of the term described above.

The annual calculation of income shall be from May 1, each year commencing May 1, 2024 and ending the following April 30, annually for purposes of a breakpoint calculation.

5: Gross Sales Defined.

The term "Gross Sales" as used herein shall mean the gross selling price of all food, liquor, beer, wine, drinks of any kind, merchandise or services sold upon or from the Premises by Tenant and all licensees, concessionaires and tenants of Tenant, whether such sales be evidenced by check, credit, charge account, exchange or otherwise, and shall include, but not be limited to, the amounts received from the sale of food, liquor, goods, wares and merchandise and for services performed on or at the Premises, together with the amount of all orders taken, processed or received at the Premises, whether such orders be filled from the Premises or at another location, including catering, and whether such sales be made by means of merchandise or other vending devices or computer or internet in or from the Premises. If any one or more departments or other divisions of Tenant's business shall be sublet by Tenant or conducted by any person, firm or corporation other than Tenant, then there shall be included in gross receipts for the purpose of fixing the percentage

rent payable hereunder all the gross sales of such departments or divisions made at or from the Premises in the same manner and with the same effect as if the business or sales of such departments and divisions of Tenant's business had been conducted by Tenant itself. Each charge or sale upon installment or credit shall be treated as a sale for the full price in the month during which such charge or sale shall be made, irrespective of the time when Tenant shall receive payment (whether full or partial) therefore. Gross sales shall not include (i) the exchange of food, liquor, beer, wine, drinks of any kind or merchandise between stores of Tenant where such exchanges are made solely for the convenient operation of Tenant's business, (ii) returns to vendors or manufacturers, (iii) sales of fixtures and equipment after use thereof in the conduct of Tenant's business, (iv) cash or credit refunds or sales discounts or made upon transactions included within Gross Sales not exceeding the selling price of merchandise returned by the purchaser and accepted by Tenant, (v) the amount of any city, county, state, or federal sales, luxury, or excise tax on such sales, which tax either is added to the selling price or absorbed therein and also is paid directly to the taxing authority by Tenant; provided, however, that no franchise or capital stock tax and no income or similar tax based upon income, profits, or gross sales as such shall be deducted from Gross Sales in any event whatsoever, or (vi) gratuities or "tips" paid to Tenant's employees. Each charge or sale upon installments or credit shall be treated as a sale for the full price in the month during which such charge or sale occurs regardless of the time when Tenant is to receive payment therefore. Layaway payments shall be included in Gross Sales at the time they are received.

6: Sales Reports and Records.

By the 10th day of each month, Tenant shall deliver to Landlord a monthly POS Summary Report and a POS Summary Report for the Lease Year to date certified by Tenant to be accurate; such statement shall reflect total Gross Sales and whether the Break Point has been reached or exceeded. Within thirty (30) days after the expiration of each Lease Year and within thirty (30) days after termination of this Lease, Tenant shall deliver to Landlord a like statement of Gross Sales for the preceding Lease Year (or partial Lease Year), certified to be correct by an independent certified public accountant and/or a copy of Tenant's sales tax report filed with the Missouri Department of Revenue or other appropriate governmental department. Tenant shall furnish similar statements for any licensees, concessionaires and subtenants. All such statements shall be in such form and shall be accompanied by such supporting information as Landlord may require. If any such statement discloses an error in the calculation of the Percentage Rent for any month, an appropriate adjustment shall be made. If Tenant fails to timely furnish any Gross Sales statement, Landlord may charge a fee of twenty-five ($25.00) per day until the required statement is furnished, from and after the tenth (10th) day following the date on which such statement was due.

Tenant shall keep for at least thirty-six (36) months after the end of the Lease Year to which they relate, at the Premises a complete and accurate set of books and records pertaining to its business and Gross Sales including, but not limited to, inventories, purchases, receipts of merchandise, and all sales and other transactions by Tenant and all pertinent supporting records applicable to Tenant's business, such as (a) cash register or electronic point of sale system tapes and written records reflecting sales data captured by electronic cash registers or other data processing equipment used by Tenant to record its sales and other transactions in the Premises; (b) serial numbered sales slips; (c) mail orders; (d) telephone orders; (e) bank deposit slips and records; (f) records showing that merchandise returned by customers was purchased by such customers; (g) receipts or other records of merchandise taken out on approval; (h) such other records of Tenant's Gross Sales which would normally be examined or required to be kept by an independent certified public account pursuant to generally accepted accounting principles; (i) all income, sales, excise and occupation tax reports and returns; and (j) such other records as Landlord reasonably may require for the purpose of reflecting, computing, or verifying Gross Sales. Such records shall be

subject to inspection and audit by Landlord and its agents at all reasonable times. If the results of any such inspection and audit show any Gross Sales statements are not submitted by Tenant or if the statements submitted are found to be incorrect to an extent of three percent (3%) or more over the figures submitted by Tenant, Tenant shall pay for Landlord's inspection or audit on demand. Additionally, if such audit reflects that the statements submitted by Tenant are incorrect to an extent of ten percent (10%) or more over the figures submitted by Tenant, then Landlord, in addition to all other remedies, may terminate this Lease upon giving five (5) days' written notice thereof to Tenant. A report of the findings of Landlord's accountant shall be binding and conclusive upon both Landlord and Tenant.

All other terms and conditions of the Lease not directly affected by this Amendment shall remain in full force and effect, including but not limited to Expense Stops as described in the original lease, and any personal guarantees.

Landlord and Tenant each hereby acknowledge that this Amendment may be executed in counterparts and exchanged by facsimile transmission or other electronic means and that the facsimile or electronic copies of each party's respective signature shall be binding as if the same were an original signature.

BB63 II, LLC-Landlord

By _____
Vincent Rigby Jr, Member VHR63, LLC
Member BB63 II, LLC

Plate Restaurant LLC-Tenant

By _____
Christian Joseph, Managing Member